USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__3/20/2020___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
                                 :

BANGLADESH BANK,               :

               Plaintiff,   :

                                 :       19 Civ. 983 (LGS)

       -against-         :

                                 :       OPINION & ORDER

RIZAL COMMERCIAL BANKING    :
CORPORATION, et al.,         :
                 Defendants. :
                                 :
-------------------------------------------------------------X

LORNA G. SCHOFIELD, District Judge:

       This action arises out of an alleged international money laundering scheme in which

North Korean hackers stole $101 million from Plaintiff Bangladesh Bank's New York Federal

Reserve account and then transferred and dispersed the money to Defendants' bank accounts and

casinos in the Philippines.  Plaintiff alleges that Defendants have violated both state law and the

Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c).[1]  Four

Defendants -- Rizal Commercial Banking Corporation ("RCBC"), Bloomberry Resorts and

Hotels  Inc. ("Bloombery") d/b/a Solaire Resort & Casino, Eastern Hawaii Leisure Company,

Ltd. ("Eastern Hawaii") d/b/a Midas Hotel & Casino, and Eastern Hawaii's owner Kam Sing

Wong -- move to dismiss the Complaint on various grounds.[2]  For the reasons below, the motion

to dismiss the civil RICO claim is granted.  In the absence of a viable federal claim, the Court

declines to exercise jurisdiction over the state law claims.  The motions to dismiss for lack of

---

[1] The state law claims, not at issue in these motions, are: conversion, aiding and abetting conversion, fraud against RCBC only, aiding and abetting fraud, conspiracy to commit fraud, conspiracy to trespass against chattels, unjust enrichment, and money had and received.

[2] The remaining 16 named Defendants have not appeared, including some who have not been served.  Defendants also include 25 John Doe Defendants who have not been named or served.

subject matter jurisdiction and under the *forum non conveniens* doctrine are denied.

## I.      BACKGROUND

The following facts are drawn from the Complaint and accepted as true for the purpose of this motion only.  *See Hu v. City of New Yor*k, 927 F.3d 81, 88 (2d Cir 2019).

Plaintiff Bangladesh Bank (the "Bank") is the central bank of the People's Republic of Bangladesh and is headquartered in Dhaka, Bangladesh.  Since 1973, the Bank has maintained a U.S. currency account ("New York Fed Account") at the Federal Reserve Bank of New York ("Federal Reserve"), with an average $1 billion balance.  The Bank uses the account to conduct eighty-five percent of its international transactions.

In February 2016, North Korean hackers broke into the Bank's computing system, issued false funds transfers and removed approximately $101 million from the Bank's New York Fed Account.  Eventually, $81 million dollars reached the Philippines, passing through bank accounts at Defendant RCBC and through casinos operated by Defendants Bloomberry and Eastern Hawaii (together, the "Casino Defendants").  The following narrative describes the path of the stolen funds.

### A.      North Korean Hacking

By January 2015, North Korean hackers identified the Bank as a target.  At that time, the hackers had penetrated the computer system at Sony Pictures Entertainment ("Sony"), and decided to use the same tools and methods against the Bank.  Specifically, the hackers began sending spear-phishing emails to Bank employees, which enticed employees to click on links that installed malware onto Bank computers.  By March 2015, the malware allowed the hackers to access, fraudulently communicate with and surveil the Bank's computer network, as well as

hide their tracks by making their contact appear authentic and authorized. On January 29, 2016, six days before the theft, the hackers accessed the Bank's SWIFTLIVE system, the platform on which the Bank communicates with other banks, including to transfer funds between banks.

The hackers began executing the theft on Thursday, February 4, 2016, after the close of business in Bangladesh. They chose this date to minimize monitoring in Bangladesh and the Philippines: in Bangladesh, the work week runs from Sunday through Thursday and businesses are closed on Friday and Saturday. In the Philippines, it was a long holiday weekend and businesses were closed from Saturday through Monday. From 8:55 p.m. through 1:00 A.M. Bangladesh time, or 9:55 a.m. through 2:00 P.M. in New York City, the hackers issued 70 fraudulent payment orders from the Bank's SWIFT platform, to transfer nearly $1 billion out of the New York Fed Account. Four of the payment orders, totaling $81 million, were fully executed.

### B.     Transfer through RCBC Accounts

RCBC is one of the largest banks in the Philippines and is headquartered in the Manila metropolitan area. The hackers' payment orders directed the stolen funds be routed through RCBC correspondent accounts in the United States and then to RCBC accounts in the Philippines.

### 1. Correspondent Accounts

Because RCBC does not have a New York Fed account, to which funds could be transferred directly, stopovers at local correspondent accounts were necessary. The funds passed through four correspondent accounts on Thursday, February 4, 2016, three of which are located at banks in New York City and the fourth at a bank in Philadelphia.

3

## 2. Fictitious Accounts

On Friday, February 5, 2016, the $81 million moved from the correspondent accounts to four fictitious accounts at RCBC in the Philippines (the "Fictitious Accounts"). John Doe Defendants and Defendant Wong of Eastern Hawaii -- a good friend of RCBC's then-President and CEO Lorenzo Tan -- created the Fictitious Accounts expressly to carry out this scheme.

RCBC later admitted that the Fictitious Accounts did not belong to real people. The Complaint alleges, however, that RCBC was aware, or should have been aware, that the accounts were fake upon opening: they were all opened on May 15, 2015, with identical $500 deposits, and sat dormant for nine months until the influx of stolen funds on February 5, 2016. Each account holder claimed to earn an identical 1.5 million pesos, equivalent to $28,000 per month, but no employment records verified their jobs. The driver's licenses of the account holders did not exist in public records. Nor did signatures on the licenses match signatures on account opening documents. Mail to the account addresses was undeliverable. Internal policy required that RCBC employees investigate and explain undeliverable mail in a weekly report to the District Sales Director. But Defendants Maia Deguito and Angela Torres, senior employees at the RCBC Jupiter branch, responsible for creating the Fictitious Account reports, failed to do so or take any other action. Furthermore, although local banks are aware of the high risk of money laundering at Philippine casinos, Defendants Deguito and Torres and other RCBC employees prepared and executed the Fictitious Account documents at casinos, including at Defendant Eastern Hawaii. Defendant Deguito testified to the Philippine Senate that Defendant CEO Tan, a good friend of Defendant Wong of Eastern Hawaii, knew about the Fictitious Accounts but did nothing.

### 3. The Philrem and Go-Centurytex Accounts

Over the following days, the $81 million moved from the Fictitious Accounts into other RCBC accounts, primarily the Philrem Accounts, via the intermediary Go-Centurytex Account. The Philrem Accounts belonged to Defendant Philrem Service Corp. ("Philrem"), a Filipino corporation co-owned by Defendants Salud Bautista and Michael Bautista. The Go-Centurytex Account belonged to Defendant William So Go, a co-owner of Defendant Centurytex Trading, another Philippine corporation. The latter account was opened on February 5, 2016, the same day the stolen funds arrived at RCBC.

On Friday, February 5, 2016, the Philrem and Go-Centurytex Accounts experienced a flurry of activity. In the late morning, Defendant Wong of Eastern Hawaii called Defendant Deguito, to ask whether the Fictitious Accounts had received funds and to arrange for their transfer into Philrem Accounts. When Defendant Deguito asked how Defendant Wong knew about the incoming funds, Defendant Wong responded, "I told you, Lorenzo [Tan, RCBC's CEO] knows this." Around this time, Defendant Deguito rapidly processed the opening of the Go-Centurytex Account, even though the account had significant red flags. For example, the driver's license submitted with account opening documents had a shoddy photograph, and stated that the license was issued that same day, February 5, 2016.

Thirteen minutes after the Go-Centurytex Account opened, Defendant Deguitos and Torres approved a $22 million cash deposit into the account from a Fictitious Account. The funds were then quickly transferred out: $14.7 million moved into a Philrem dollar Account, was converted to pesos and moved into a Philrem pesos Account, and then $12.46 million was withdrawn as manager's checks. Another party directly withdrew $380,000 in cash pesos from

5

the Go-Centurytex Account. The cash was handed off to someone in a car, allegedly belonging to Defendant Go or Defendant Deguito, in the RCBC parking lot. A later investigation found that security cameras in the parking lot were not working from February 4 to 9, 2016, due to tampering. The same afternoon, Defendant Michael Bautista of Philrem directed RCBC's Treasury Department to purchase $13.5 million of pesos using funds from a Fictitious Account, and to deposit the pesos into a Philrem Account.

As a result of this activity, RCBC placed a temporary hold on the Philrem and Go-Centurytex Accounts that evening, February 5, 2016. Yet, RCBC lifted the hold forty-five minutes later, per the order of Defendant Raul Tan, the recent former Head of Retail Banking. Defendant Tan's team had learned from Defendant Deguito that the transactions were expected, were for wealthy longtime clients at the Solaire Casino, and therefore could proceed.

On Tuesday, February 9, 2016, after the long holiday weekend in the Philippines, the Fictitious Accounts continued to be drained. Between 10:24 a.m. and 11:37 a.m., RCBC employees moved $42.9 million into the Go-Centurytex Account and $15.2 million into a Philrem Account, leaving only around $10,000 in the Fictitious Accounts. Immediately after each of these transfers, Defendant Michael Bautista arranged for $32 million of the transferred funds to be converted into pesos and deposited into a Philrem Account. From the Go-Centurytex Account, Defendants Deguito and Torres transferred $20 million into a Philrem Account and another $13 million into an account held by Abba Currency Exchange ("Abba Account"). At 3:12 p.m., $3 million in the Abba Account was subsequently transferred into another account, held by Beacon Currency Exchange ("Beacon Account").

As RCBC was processing these transactions, it knew that the transfers from the New

York Fed Account were fraudulent. Around 9:11 a.m. that Tuesday morning, RCBC received urgent "STOPPAY" messages from the Bank, requesting that RCBC immediately freeze all Fictitious Accounts, due to the "doubtful transactions" from the New York Fed Account. The Bank had actually sent the messages on Monday via the SWIFT server, but RCBC had been mysteriously logged off the SWIFT server from Sunday, February 7, at 6:54 a.m. until Tuesday, February 9, at 9:11 a.m. By 10:59 a.m., RCBC forwarded the "STOPPAY" messages to the Jupiter branch, where Defendants Deguito and Torres worked, yet branch employees continued to process Fictitious Account transfers and related transfers until 3:12 p.m. Only at 3:31 p.m, following a meeting among Defendant Tan, the Legal and Regulatory Affairs Group and Retail Banking Group, did RCBC finally place a hold on the Fictitious Accounts. RCBC did not, however, freeze the Go-Centurytex, Philrem, Abba or Beacon Accounts, which, by that point, held the funds from the Fictitious Accounts. RCBC informed the Bank that it had frozen the Fictitious Accounts, not disclosing that the accounts were nearly empty. Defendant Deguito was tasked with preparing a report for the Anti-Money Laundering Department, but she failed to do so or respond to e-mails requesting the report until two nights later.

Over the following days, RCBC employees continued to transfer the stolen funds. On Wednesday, February 10, 2016, the Bank sent RCBC another emergency "STOPPAY" message, requesting that RCBC "back the funds to" the New York Fed Account, as the original transfers had been "fraudulent." Yet later that day, the RCBC Treasury Department traded $15 million in a Philrem Account for pesos, on Defendant Bautista's request. When notified of the trade, CEO Tan allowed it. The following day, on Thursday, February 11, 2016, RCBC transferred $3 million from the Beacon Account and $10 million from the Abba Account into the Philrem

7

Accounts. With these last transactions, $80.1 million, out of the $81 million stolen, were moved from the Fictitious Accounts into the Philrem Accounts. The Complaint alleges that RCBC could have made up to millions of dollars processing the transactions.

### C. Dispersal to Solaire, Eastern Hawaii and Other Casinos

Defendant Philrem dispersed the funds to the Casino Defendants and other businesses and individuals. From February 5 to 11, 2016, Philrem deposited about 1.4 billion pesos, approximately $29 million, into Defendant Bloombery's account outside of RCBC. Bloombery, which operates Solaire Casino, then converted the funds into casino chips and distributed the chips to players and junkets, *i.e.* VIP playing rooms. The chips were played for over a month until March 10, 2016, when the casino ended all gaming sessions using the chips. By that point, most of the chips were gone. Defendant Philrem also delivered cash totaling $31 million to individual Defendants who played at Solaire.

Similarly, on February 10 and 11, 2016, Philrem deposited 1 billion pesos, equivalent to $20 million, in Defendant Eastern Hawaii's account outside of RCBC ("Eastern Hawaii Account"). Defendant Eastern Hawaii operates the Midas Casino. Defendant Wong controlled the Eastern Hawaii Account, and moved funds back and forth between this account and his personal account to complicate the money trail. Eastern Hawaii and Wong have not been forthcoming about where the funds subsequently went.

## II. MOTIONS TO DISMISS UNDER FED. R. Civ. P. 12

### A. Legal Standards

"A district court properly dismisses an action under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction if the court lacks the statutory or constitutional power to adjudicate

it." *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.A.R.L.*, 790 F.3d 411, 416–17 (2d Cir. 2015) (internal quotation mark omitted). "[T]he question of whether a federal statute supplies a basis for subject matter jurisdiction is separate from, and should be answered prior to, the question of whether the plaintiff can state a claim for relief under that statute." *Carlson v. Principal Fin. Grp.*, 320 F.3d 301, 306 (2d Cir. 2003). Where subject matter jurisdiction is premised on a federal statute, *see* 28 U.S. Code § 1331, dismissal is required if the claims arising under the statute are "wholly insubstantial and frivolous" or "made solely for the purpose of obtaining jurisdiction." *Carlson*, 320 F.3d at 306; *accord Backer v. USD 30 Billion MTN Programme*, No. 16 Civ. 6577, 2017 WL 6387732, at *5 (S.D.N.Y. Sept. 30, 2017)*; see Shapiro v. McManus*, 136 S. Ct. 450, 455 (2015) ("We have long distinguished between failing to raise a substantial federal question for jurisdictional purposes . . . and failing to state a claim for relief on the merits; only 'wholly insubstantial and frivolous' claims implicate the former") (holding that applying the *Twombly*/*Iqbal* standard to a Rule 12(b)(1) motion is "too demanding and inconsistent with our precedents"). If federal question jurisdiction exists, the court has discretion whether to retain supplemental jurisdiction over related state-law claims, even if it has dismissed all federal claims. *See Cohen v. Postal Holdings, LLC*, 873 F.3d 394, 399 (2d Cir. 2017). By contrast, "a district court has no such discretion when it properly dismisses, *pursuant to Rule 12(b)(1)*, all federal claims[.]" *See id.* (emphasis added).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice." *Id.* On a Rule 12(b)(6) motion, "all factual allegations in the complaint are accepted as true and all inferences are drawn in the plaintiff's favor." *Littlejohn v. City of N.Y.*, 795 F.3d 297, 306 (2d Cir. 2015).

## B. Discussion

The motion to dismiss for lack of subject matter jurisdiction is denied, but the motion to dismiss the civil RICO claim for failure to state a claim is granted. Because there is no viable federal claim, the Court declines to exercise supplemental jurisdiction over the state law claims. *See* 28 U.S.C. § 1367(c)(3) (A court "may decline to exercise supplemental jurisdiction" over state law claims where it "has dismissed all claims over which it has original jurisdiction.").

### 1. Federal Question Jurisdiction

A federal claim is "wholly insubstantial or frivolous," requiring dismissal under Rule 12(b)(1), when the claim is "legally speaking non-existent," "essentially fictitious" or "obviously without merit." *Shapiro*, 136 S. Ct. at 456. These "adverbs [are] no mere throwaways; the limiting words wholly and obviously have cogent legal significance." *Id.* (internal quotation marks omitted) (gerrymandering claim was not "wholly insubstantial or frivolous" where pleading attempted to track Supreme Court precedent). The RICO claim "clears [this] low bar." *Id.* The Complaint is a detailed 103-page tome alleging that a group of people and entities committed a series of crimes, cognizable as predicate racketeering acts, under the RICO statute. Although the RICO claim ultimately fails, the pleading is not "wholly insubstantial or frivolous." Dismissal for lack of subject matter jurisdiction is denied.

### 2. Supplemental Jurisdiction

Because the only federal claim is not sufficiently pleaded, the Court declines to exercise

supplemental jurisdiction over the remaining state law claims. *See Wright v. Musanti*, 887 F.3d 577, 582 n.2 (2d Cir. 2018) (A court "may, at its discretion, exercise supplemental jurisdiction over state law claims even where it has dismissed all claims over which it had original jurisdiction.") (internal quotation marks removed). The court should "weigh various factors, such as judicial economy, convenience, fairness, and comity" in considering whether to retain supplemental jurisdiction. *Id.* But "'in the usual case in which all federal-law claims are eliminated before trial,' the balance of factors will weigh in favor of declining to exercise supplemental jurisdiction." *TPTCC NY, Inc. v. Radiation Therapy Servs., Inc*., 453 F. App'x 105, 107 (2d Cir. 2011) ("[W]hen the federal-law claims have dropped out of the lawsuit in its early stages . . . the federal court should decline the exercise of jurisdiction.") (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). Because this case is in its infancy, exercising supplemental jurisdiction over remaining state claims is inappropriate.

### 3. Failure to State a RICO Claim

To state a substantive civil RICO claim under 18 U.S.C. § 1962(c), a plaintiff must allege that defendants, through their "associat[ion] with an enterprise[,] conduct[ed] or participat[ed], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). A "pattern of racketeering activity" requires at least two related predicate acts, *see* 18 U.S.C. §§ 1961(1) & 1961(5), which either (i) extended over a "substantial period of time" but need not be ongoing, *i.e.* "close-ended continuity," *H.J. Inc. v. Nw. Bell Tel. Co*., 492 U.S. 229, 230, 242 (1989), or (ii) poses a "threat of continuing criminal activity beyond the period during which the predicate acts were performed," *i.e.* "open-ended continuity," *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008)*; accord Grace Int'l*

*Assembly of God v. Festa*, No. 19 Civ. 1101, 2019 WL 7293871, at *2 (2d Cir. Dec. 30, 2019)

(summary order) (applying *H.J. Inc.*); *Ramiro Aviles v. S & P Glob., Inc.*, 380 F. Supp. 3d 221,

268 (S.D.N.Y. 2019) (applying *Spool*). An "enterprise" means, in relevant part, "any individual .

. . or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(5).

Defendants argue that the Complaint does not sufficiently plead (1) a "pattern of racketeering

activity" or (2) the existence of an "enterprise." The Court agrees.

### a) Failure to State a RICO Claim -- Pattern of Racketeering Activity

The Complaint fails to plead either close- or open-ended continuity necessary to state a

pattern of racketeering activity. Whether the alleged predicate acts are themselves sufficiently

pleaded is not reached.

### i. Close-Ended Continuity

To determine close-ended continuity, courts "weigh[] a variety of non-dipositive factors,

including, *inter alia*, the length of time over which the alleged predicate acts took place, the

number and variety of acts, the number of participants, the number of victims, and the presence

of separate schemes." *GICC Capital Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 467 (2d Cir.

1995); *accord Ramiro Aviles*, 380 F. Supp. 3d at 269 (S.D.N.Y. 2019). "Although we have not

viewed two years as a bright-line requirement, it will be rare that conduct persisting for a shorter

period of time establishes closed-ended continuity, particularly where . . . the activities alleged

involved only a handful of participants and do not involve a complex, multi-faceted conspiracy."

*Spool*, 520 F.3d 178, 184 (2d Cir. 2008) (internal quotation marks omitted) (the Second Circuit

has "never held a period of less than two years" to be sufficient); *accord Gruber v. Gilbertson*,

No. 16 Civ. 9727, 2019 WL 4458956, at *7 (S.D.N.Y. Sept. 17, 2019). Placing "weight [on] the

duration of criminal activities . . . is required to effectuate Congress's intent to target '*long-term criminal conduct*.'"  *GICC Capital Corp.*, 67 F.3d at 467 (quoting *H.J. Inc.*, 492 U.S. at 242) (emphasis added).

Here, the alleged predicate acts extend at most fourteen months -- from January 2015 to March 2016 -- which is "generally" too short.  *Reich v. Lopez*, 858 F.3d 55, 60 (2d Cir. 2017) ("Predicate acts separated by only a few months will not do; this Circuit generally requires that the crimes extend over at least two years.") (internal quotation marks and citation omitted).  Nor do other factors establish close-ended continuity.

The first time a Defendant possibly committed an alleged predicate act is in January 2015.  The Complaint pleads that, by January 2015, the hackers had identified the Bank as its victim and that, by May 2015, at least Defendants RCBC, Eastern Hawaii, Wong and other RCBC employees had set up the Fictitious Accounts.  Therefore, the earliest possible time any Defendants may have acted is in January 2015, after the idea for the theft first materialized. Although the Complaint alleges that "[t]he wide ranging conspiracy to rob hundreds of millions of dollars from the Bank began years earlier with, on information and belief, North Korean hackers," the hackers are not included among the Defendants.[3]  *See Spool*, 520 F.3d at 184 ("The law is clear that 'the duration of a pattern of racketeering activity is measured by the RICO predicate acts' that the *defendants* are alleged to have committed." (emphasis added)).  Even if the hackers were included as Defendants, the Complaint later makes clear that what is meant by

---

[3] Although the Complaint defines the John Doe Defendants to include "any other individual or entity that was involved in the theft," the hackers are not included in this category, and are never otherwise identified as Defendants.

the "years earlier" allegation is that, in 2014, the hackers used "the same tools and techniques that they would later use on the Bank . . . to infiltrate the computer systems of Sony." This is not an allegation that the pattern of racketeering activity at issue began in 2014, because (1) the Complaint defines the pattern of racketeering activity with reference to the narrow purpose of the bank theft, *i.e.* "to defraud, steal, and launder funds stolen from the Bank," and (2) the Complaint does not suggest that the plan of robbing Plaintiff was even conceived until January 2015. There are otherwise no other allegations suggesting involvement in racketeering activity by Defendants before January 2015.

As to the end date of the racketeering activity, the latest act the Complaint alleges by any Defendant is in March 2016. Until that point, Defendants Bloomberry and Eastern Hawaii allowed chips traceable to the stolen funds to be played in their casinos. Although Plaintiff argues that the laundering extended beyond that point because some funds remain unaccounted for, the Complaint does not plead any specific actions by particular Defendants. Plaintiff also argues that Defendants attempted to cover up their actions after local authorities began investigating, thereby extending the duration of predicate acts. Presumably, Plaintiff is suggesting that a relevant predicate act is obstruction, but the obstruction violations that the RICO statute recognizes are obstruction of *U.S.* proceedings and investigations, not those in other countries. *See* 18 U.S.C. § 1961(1) (setting out obstruction violations qualifying as predicate acts). Furthermore, Defendants' "fraudulently conceal[ing] their illegal activities for a number of years is inadequate to satisfy the continuity requirement of the RICO statute." *Rio Tinto PLC v. Vale*, No. 14 Civ. 3042, 2015 WL 7769534, at *10 (S.D.N.Y. Nov. 20, 2015) (internal quotation marks and citation omitted). The fourteen-month duration, from January 2015

to March 2016, is presumptively too short for close-ended continuity.

Other factors fail to establish close-ended continuity. In the rare case where a court finds close-ended continuity, even though the duration of criminal activity is less than two years, the activity must be unusually complex. *See GICC Capital*, 67 F.3d at 468 ("Only one case arguably supports plaintiff's" claim that a group of defendants allegedly "looting [the] assets" of a single entity over thirteen months is sufficient for close-ended continuity. That case, however, involved a unique "multi-faceted conspiracy" and may not have survived an "appeal[] to this court"). The scheme here was not a "complex, multi-faceted conspiracy." *Spool*, 520 F.3d at 184. Although it involved *technically* complex hacking methods and circuitous bank transfers, the plan itself was focused, cohesive and not multi-faceted: malfeasors stole a single victim's money from one location on a particular night and then dispersed the money to hide their tracks. The allegations fail to describe the *variety* of crimes, parties, or goals necessary to establish a complex scheme for close-ended continuity. *See GICC Capital*, 67 F.3d at 467 (District courts should weigh the "*number* and *variety* of acts," the "presence of *separate* schemes" and the duration these acts cover for close-ended continuity (emphasis added)); *Polycast Tech. Corp. v. Uniroyal, Inc.*, 728 F. Supp. 926, 948 (S.D.N.Y. 1989) (finding a "complex, multi-faceted conspiracy" sufficient for close-ended continuity where defendants "defrauded . . . in a *variety* of ways." (emphasis added)).

### ii. Open-Ended Continuity

The Complaint also fails to plead open-ended continuity. Open-ended continuity requires that the criminal activity "by its nature project[] into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241. This can be "established in several ways," by showing that the predicate

acts "by their very nature include a future threat," a "primarily unlawful" enterprise "continu[es]" its operations, or the "regular way of operating [an ongoing] business" involves committing crime. *Reich*, 858 F.3d at 60.

The allegations do not satisfy any of these theories. The alleged crimes do not project into the future by their nature. As discussed, the scheme was to steal the Bank's money from a particular account on one evening and then launder it. That the money remains missing does not mean that Defendants would continue carrying out the crime. Indeed, money laundering by its nature involves moving money as far away as possible from the initial source and transferees to avoid discovery. The Complaint emphasizes the *speed* by which the funds passed through and out of Defendants' hands. Plaintiff also argues that frustration of Defendants' activities by the authorities does not mean there was no risk of future activities. But this argument assumes there was a risk. The Complaint does not provide any specific allegations of continuing or likely future activity by any Defendants. Simply because the Complaint alleges that Defendants Bloomberry and RCBC had a longtime banking relationship does not establish that they would coordinate future racketeering. The allegation that hackers have refined their methods to launch future cyberattacks is also unhelpful, because it concerns non-parties.

### b) Failure to State a RICO Claim -- Existence of an Enterprise

The Complaint fails to plead the existence of an "enterprise" necessary for RICO liability. Where, as here, the alleged enterprise is a "group of individuals associated in fact," *see* 18 U.S.C. § 1961(4), a complaint must plead that the "various associates" function together as a unit for a "common purpose." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc*., 385 F.3d 159, 174 (2d Cir. 2004); *accord Democratic Nat'l Comm. ("DNC") v. Russian Fed'n*, 392 F. Supp.

16

3d 410, 439 (S.D.N.Y. 2019). An association in fact enterprise must have "[1] a purpose, [2] relationships among those associated with the enterprise, and [3] longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States,* 556 U.S. 938, 946 (2009); *accord DNC*, 392 F.3d at 439. Critically, "a requirement in this Circuit" is that the enterprise engages in a "course of fraudulent or illegal conduct separate and distinct from the alleged predicate racketeering acts themselves." *First Capital*, 385 F.3d at 174; *accord DNC*, 392 F.3d at 439; *Weir v. Cenlar FSB*, No. 16 Civ. 8650, 2018 WL 3443173, at *5 (S.D.N.Y. July 17, 2018).

The Complaint alleges that an enterprise was formed either (1) among the hackers and Defendants or (2) among RCBC and its employees and the Casino Defendants. Under either theory, the Complaint fails to plead that the enterprise members were associated as a group apart from their alleged racketeering activity. The alleged illegal purpose of the enterprise was to defraud the Bank and then hide and disperse the proceeds. As in *First Capital*, the Complaint does not sufficiently plead a RICO enterprise because the Complaint:

> fails, however, to detail any *course* of fraudulent or illegal conduct separate and distinct from the alleged predicate racketeering acts themselves—a requirement in this Circuit. Plaintiffs certainly have not advanced any factual allegations that the . . . Enterprise was an ongoing organization, formal or informal, or any evidence that the various associates of the alleged enterprise functioned as a continuing unit. Moreover, Plaintiffs have failed to provide us with any solid information regarding the hierarchy, organization, and activities of this alleged association-in-fact enterprise from which we could fairly conclude that its members functioned as a unit. Thus, there is no basis to support the conclusion that the supposed constituent entities of the . . . were associated together for a common purpose of engaging in a course of conduct.

*First Capital*, 385 F.3d at 174-75 (internal citations and quotation marks omitted). At most, the Complaint suggests that alleged enterprise members had relationships outside the immediate

scheme, but this fact alone does not create a RICO enterprise. *See Equinox Gallery Ltd. v. Dorfman*, 306 F. Supp. 3d 560, 571 (S.D.N.Y. 2018) (If there were no enterprise requirements, "any two thieves in cahoots would constitute an association in fact.") (internal quotation marks omitted).

Plaintiff appears to imply that a RICO claim does not require alleging an enterprise that exists apart from the alleged racketeering activity, citing *Pavlov v. Bank of New York Co.*, 25 F. App'x 70, 71 (2d Cir. 2002) (summary order) (An "enterprise need not necessarily have a continuity extending beyond the performance of the pattern of racketeering acts alleged, or a structural hierarchy, so long as it is in fact an enterprise as defined in the statute."). But this argument contradicts *First Capital*'s more recent and explicit directive that allegations of illegal conduct separate from the racketeering acts are a "requirement in this Circuit." Plaintiff's reliance on *Equinox Gallery* is likewise unavailing, because it expressly recognizes the separate conduct requirement. *See Equinox Gallery*, 306 F. Supp. 3d at 571 ("[T]he enterprise must exist 'separate and apart from the pattern of activity in which it engages.'") (citing *United States v. Turkette*, 452 U.S 576, 583 (1981)).

### 4. RICO Conspiracy

The Complaint pleads only a substantive RICO claim under 18 U.S.C. § 1962(c), and does not expressly plead a RICO conspiracy under 18 U.S.C. § 1962(d). Both parties, however, briefly address whether the Complaint may allege a RICO conspiracy claim, because Plaintiff writes in a May 10, 2019, letter that the Complaint "alleges a conspiracy as well." *See* Dkt. No. 129 at 6. Even if the Complaint were amended and such a claim were added, the claim would not survive. Leave to amend is therefore denied. *See Attestor Value Master Fund v. Republic of*

18

*Argentina*, 940 F.3d 825, 833 (2d Cir. 2019) ("[D]enial of leave to amend is proper if amendment would be futile.").

Because Plaintiff does not adequately allege the continuity of predicate acts necessary for substantive RICO liability, a RICO conspiracy claim based on the same theory of RICO liability would not survive. *See Williams v. Affinion Grp., LLC*, 889 F.3d 116, 126 (2d Cir 2018) (affirming dismissal of RICO conspiracy claim where substantive RICO violations were insufficiently pled, and plaintiffs did not allege any further acts that, if carried out, would have satisfied RICO's requirement of a pattern of racketeering); *First Capital*, 385 F.3d at 182. In particular, the Complaint does not suggest that Defendants agreed to perform additional predicate acts that, if committed, would have established sufficient continuity. "To the contrary Defendants appear to have carried out all the predicate acts they agreed to commit. There was, therefore, no agreement to engage in a pattern of racketeering activity." *Cofacredit, S.A. v Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229, 245 (2d Cir. 1999) (reversing and finding no liability on the the RICO conspiracy claim); *accord AmBase Corp. v. 111 W. 57th Sponsor LLC*, 785 Fed. App'x. 886, 889 (2d Cir. 2019) (summary order) (affirming dismissal of RICO conspiracy claim where the RICO substantive claim failed adequately to allege continuity).

## III.    MOTION TO DISMISS FOR *FORUM NON CONVENIENS*

### A.    Legal Standard

"The grant or denial of a motion to dismiss for *forum non conveniens* is generally committed to the district court's discretion." *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 99 (2d Cir. 2000); *accord Stewart v. Manhattan Yacht Club, Inc.*, No. 16 Civ. 9764, 2018 WL 3579849, at *2 (S.D.N.Y. July 25, 2018). Whether dismissal is appropriate is based on a three-

part test: "(1) the deference to be accorded the plaintiff's choice of forum; (2) the adequacy of the alternative forum proposed by the defendants; and (3) the balance between the private and public interests implicated in the choice of forum." *Fasano v. Yu*, 921 F.3d 333, 335 (2d Cir. 2019); *see Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71 (2d Cir.2001) (en banc). The movant carries the burden of proof. *See Wiwa*, 226 F.3d at 100; *accord Little v. XL Ins. Co. SE,* 18 Civ. 11919, 2019 WL 6119118, at *5 (S.D.N.Y. Nov. 18, 2019).

### B. Discussion

Dismissal for *forum non conveniens* is denied. Plaintiff's choice of forum is accorded deference. While Defendant has identified the Philippines as an adequate alternative forum, the private interest factors are neutral and the public interest factors weigh toward Plaintiff's forum. Given that these three considerations favor Plaintiff on balance, dismissal under the *forum non conveniens* doctrine is unwarranted.

### 1. Deference to Plaintiff's Choice of Forum

Plaintiff's choice to bring this action in the Southern District of New York is accorded deference. Although "the choice of a United States forum by a foreign plaintiff is entitled to less deference" compared to when a plaintiff sues in its home forum, this standard by its terms does not foreclose deference to a foreign plaintiff. *Iragorri*, 274 F.3d at 71. "The more it appears that a domestic *or foreign plaintiff's* choice of forum has been dictated by reasons that the law recognizes as valid, the greater the deference" accorded, such as when the lawsuit has a "bona fide connection to the United States and to the forum of choice." *Id.* at 71-72 (emphasis added). Evidence that a foreign plaintiff is merely forum shopping undercuts deference. *See id.* at 72.

The obvious bona fide connection to the Southern District is that the theft took place

here.  The theft targeted a major U.S. institution located in New York City, the Federal Reserve.

Critical evidence of the fraudulent payment orders, the movement of the stolen funds into

correspondent accounts and the movement out of those accounts abroad exists in or close to this

district.  Three of the four correspondent accounts are in New York City and one is located

nearby in Philadelphia.  Federal Reserve Senior Vice President Anne Baum attests in a

declaration that the Federal Reserve and the Bank have entered into a formal agreement,

whereby the Federal Reserve will "provide technical assistance to Bangladesh Bank in its

litigation."

Defendant argues that Plaintiff's choice of the Southern District should not be accorded

deference because Plaintiff is forum shopping, in order to avail itself of the "possibility of RICO

treble damages."  Plaintiff responds, however, that it could pursue "treble damages" or similar

damages in Philippine courts, even though the filing fee would be extremely large.  *See* Pl's

Opp'n Br., Dkt. No. 146, at 20.  Defendant's forum shopping argument is rejected.  It is based on

speculation and insufficient to undermine deference to Plaintiff's forum.

### 2.  Adequate Alternative Forum

Defendant has carried its burden of establishing that the Philippines is an adequate

alternative forum.  "An alternative forum is adequate if the defendants are amenable to service of

process there, and if it permits litigation of the subject matter of the dispute."  *Norex Petroleum*

*Ltd. v. Access Indus., Inc*., 416 F.3d 146, 157 (2d Cir. 2005); *accord Accent Delight Int'l Ltd. v.*

*Sotheby's*, 394 F. Supp. 3d 399, 410 (S.D.N.Y. 2019).

Defendants argue, providing affidavits in support, that they are amenable to service in the

Philippines.  Almost all Defendants are Philippine residents or corporations, thus facilitating

service in the Philippines. Plaintiff argues that Defendants have not established that the Chinese

Defendants will accept service of process in the Philippines. But this issue is not unique to the

Philippines, as Plaintiff has been unable to serve the Chinese Defendants in this forum as well.

The Philippines is also an adequate forum based on the second factor, that the subject

matter of the dispute can be litigated in Philippine courts. Former Philippine Solicitor General,

Jose Anselmo Imperial Cadiz, states in his declaration that Plaintiff can bring a comparable civil

RICO claim in Philippine courts. *See* Cadiz Decl. ¶¶ 15-16; *accord Transunion Corp. v.*

*PepsiCo, Inc*., 811 F.2d 127, 129 (2d Cir. 1987). Plaintiff does not dispute the availability of an

analogue claim, but argues only that filing fees are prohibitively high and that litigation and

discovery will proceed extremely slowly in the Philippines. These claims, however, do not

undermine the fact that the Philippines will "permit[] litigation of the subject matter of the

dispute." *Norex*, 416 F.3d at 157.

### 3. Public and Private Interest Factors

In considering whether Plaintiff's forum or the alternative forum is appropriate, courts

weigh the private and public interest. *See Fasano*, 921 F.3d at 335. The private interest factors

include: "(1) the relative ease of access to sources of proof; (2) the availability of compulsory

process for attendance of unwilling witnesses; (3) the cost of obtaining attendance of willing

witnesses; (4) issues concerning the enforceability of a judgment; and (5) all other practical

problems that make trial of a case easy, expeditious, and inexpensive." *United Feature*

*Syndicate v. Miller Features Syndicate, Inc.*, 216 F. Supp. 2d 198, 207 (S.D.N.Y. 2002) (*citing*

*Murray v. British Broadcasting Corp*., 81 F.3d 287, 294 (2d Cir.1996)). The public interest

factors include: "(1) the administrative difficulties flowing from court congestion; (2) the local

interest in having controversies decided at home; (3) the interest in having a trial in a forum that is familiar with the law governing the action; (4) the avoidance of unnecessary problems in conflict of laws or in the application of foreign law; and (5) the unfairness of burdening citizens in an unrelated forum with jury duty." *See id.* In this case, the private interest factors are neutral, but the public interest factors favor Plaintiff.

With respect to the private interest factors, it is too simplistic to conclude that, since most Defendants are based in the Philippines, evidence is necessarily easier to access there. Much of the relevant evidence is in electronic form accessible from either forum. In addition, authorities in both the Philippines and the United States have investigated some of the events in this action. Their findings are accessible from anywhere on the internet, and in appropriate circumstances, this Court may take judicial notice of them. Defendant argues, to the contrary, that Philippine data security laws will restrict production of electronic evidence, but presumably these restrictions would tie Defendants' hands in any forum. Defendants argue that a Philippine forum is superior, because a Philippine court can "compel[]" disclosure of data subject to the privacy laws, while U.S. courts cannot. *See* Cadiz Decl. ¶¶ 17-18. This court, however, *does* have compulsory powers over the Defendant entities that are parties to this case. And, as former Philippine Supreme Court Justice and Solicitor General Antonio Eduardo B. Nachura attests in his declaration, compliance with such discovery orders would not open the parties to legal exposure in the Philippines: "Philippine courts will not question the authority of a New York court or regulatory body to direct data to be disclosed by a bank that has fallen under the jurisdiction of a New York court." Nachura Decl. ¶ 39.

With regard to witnesses, the parties may obtain witness testimony through written

23

discovery or conduct depositions remotely by video conference.  The parties have suggested at the initial conference that they are working with local counsel or contacts in the Philippines, who may facilitate these interactions.  To the extent that third parties are unwilling to comply with discovery requests, both this Court and Philippine courts have mechanisms to enforce discovery.  Mr. Nachura attests that, although the Philippines is not a party to the Hague Convention, letters rogatory are available.  *See* Nachura Decl. ¶ 48.  He also attests that unwilling parties "often resist and refuse to comply with discovery requests" in Philippine courts, so it is not apparent that Philippine courts are more effective than this Court in enforcing discovery orders.  *See* Nachura Decl. ¶ 34.

The parties' Philippine law experts provide conflicting views on how easily a U.S. judgment may be domesticated in the Philippines.  By contrast, Defendants are indisputably subject to this Court's judgment enforcement authority.  While it is premature to consider how any U.S. judgment could be enforced, the Complaint alleges that Defendants have U.S. property that, in theory, could be subject to attachment.  In light of the foregoing, Defendants have failed to carry their burden of showing that the private interest factors favor the Philippines.

The public interest factors, however, slightly favor this forum.  This action is brought under U.S. federal and state law, and this forum is necessarily superior at adjudicating these claims.  Except for Philippine data privacy laws, Defendant has not suggested that any foreign law applies.  *See Manu Int'l, S.A. v. Avon Prods., Inc*., 641 F.2d 62, 68 (2d Cir. 1981) ("[W]e must guard against an excessive reluctance to undertake the task of deciding foreign law, a chore federal courts must often perform."); *accord Shtofmakher v. David*, No. 14 Civ. 6934, 2015 WL 5148832, at *4 (S.D.N.Y. Aug. 17, 2015).  While Mr. Cadiz states that the Philippine courts are

accustomed to complicated cross-border cases like this one, Mr. Nachura attests that it is "not unusual" for such cases to "take ten (10) to twenty (20) years to reach a conclusion." *See* Nachura Decl. ¶ 8. It would be highly unlikely for adjudication to take anywhere close to this long in this forum. Finally, the local interest factors are neutral. Both New York and the Philippines have an interest in this action because critical events took place in both locations. A New York jury has an interest in adjudicating, and would not be burdened by, a case in which a major federal institution in the district was cyberattacked.

In light of the foregoing, and because the considerations slightly favor Plaintiff's choice of forum, the motion to dismiss under the *forum non conveniens* doctrine is denied.

## IV.  CONCLUSION

For the foregoing reasons, the motion to dismiss Count VII of the Complaint -- the only federal claim -- is GRANTED, and the Court declines to exercise supplemental jurisdiction over the remaining state law claims. The motions to dismiss for lack of subject matter jurisdiction and under the *forum non conveniens* doctrine are DENIED.

The Clerk of Court is respectfully directed to close Dkt. Nos. 136 and 139.

SO ORDERED.

Dated: March 20, 2020
New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE